1          IN THE UNITED STATES MAGISTRATE COURT
                WESTERN DISTRICT OF TEXAS
2                   EL PASO DIVISION

3

UNITED STATES OF AMERICA         )
4                                )
v                                )    No. EP:17-MJ-4499(1)MAT
5                                )
BLANCA NIEVE VASQUEZ-HERNANDEZ)
6

7        *LAFLER FRYE* and EVIDENTIARY HEARINGS
           BEFORE THE HONORABLE MIGUEL A. TORRES
8            UNITED STATES MAGISTRATE JUDGE
                  NOVEMBER 27, 2017
9

10   APPEARANCES:

11   For the Government:   Ms. Noemi Lopez
                           Mr. Douglas Rennie
12                         Ms. Laura Franco-Gregory
                           Assistant United States Attorney
13                         700 East San Antonio, Suite 200
                           El Paso, Texas 79901
14

15   For the Defendant:    Mr. Sergio Garcia
                           Assistant Federal Public Defender
16                         700 East San Antonio, Suite D-401
                           El Paso, Texas 79901
17

18   Interpreter:          Provided

19

20

21

22

23   Proceedings recorded by electronic recording.

24   Transcript produced by Rhonda McCay, CSR, RPR.

25

1          (Proceedings called to order)

2          THE COURT:  All right.  Good morning.  And let

3  me have just a moment here.  Thank you.

4          All right.  The Court calls the following

5  cases:

6          17-M-4409, United States of America versus Elba

7  Luz Dominguez-Portillo;

8          In EP:17-M-4456, United States of America

9  versus Maynor Alonso Claudino Lopez, EP:17-M-4461;

10          United States of America versus Jose Francis

11  Yanes-Mancia;

12          EP:17-M-4462, United States of America versus

13  Natividad Zavala-Zavala;

14          And EP:17-M-4499, United States of America

15  versus Blanca Nieve Vasquez-Hernandez.

16          We are here for an evidentiary hearing.  We're

17  also here for a *Frye Lafler* hearing.

18          Let me have announcements, please.

19          MS. LOPEZ:  Good morning, Your Honor.  Noemi

20  Lopez, Douglas Rennie, and we're ready for the United

21  States.

22          THE COURT:  Good morning.

23          MR. GARCIA:  And good morning, Judge.  Sergio

24  Garcia, on behalf of all the defendants.  Ready to

25  proceed, Judge.

1      THE COURT:  Good morning.

2      All right.  We do have a pending motion to

3 dismiss that the defendant -- the defendants filed.  The

4 Court ordered an evidentiary hearing to afford the

5 parties the opportunity to present any evidence that

6 they felt might be necessary.  We discussed this briefly

7 at the hearing last week.

8      Let me start with the -- with Mr. Garcia.  Do

9 you have any evidence that you wish to put on?

10      MR. GARCIA:  No, Judge.  We'd just like to --

11 to request argument so that we can establish a clear

12 record for purposes of any possibility of appeal.

13      THE COURT:  All right.  Let me ask the

14 government.  Does the government have any witnesses it

15 wishes to present?

16      MR. RENNIE:  No, Your Honor, we do not.

17      THE COURT:  Okay.  Thank you.

18      And, you know, I'll give you, in terms of -- of

19 argument, I guess, basically, at this point, if you want

20 to just address the substance of the motion to dismiss,

21 we can take that up, and -- but I'll give you --

22      MR. GARCIA:  I'll only need about five, ten

23 minutes just -- just to argue, just to make sure that

24 the record is clear.

25      THE COURT:  Okay.

1      MR. GARCIA:  It's important that the record is

2  clear.

3      THE COURT:  Let's try to go with about five, if

4  we could, and I'll give the government, obviously, the

5  same opportunity.

6      MR. GARCIA:  Thank you, Judge.

7      THE COURT:  Yes, sir.

8      MR. GARCIA:  Thank you, Judge.

9      Judge, with respect to our motion to dismiss,

10  it is important to understand that we are not here with

11  our motion testing the strength or the weakness of a

12  1325 charge.  We actually are arguing that these

13  defendants shouldn't even be here.  They should be in

14  immigration court.

15      What we're arguing is the element of

16  compulsion, in other words, the separation from their

17  children that removes the voluntariness of any possible

18  plea in violation of due process.  The law is clear

19  under the Flores Settlement Agreement, these defendants

20  cannot be separated from their children.

21      Immigration Customs Enforcement, ICE, the

22  branch at interest, directives provide, quote, ICE

23  personnel should ensure that the agency's immigration

24  enforcement activities do not unnecessarily disrupt the

25  parental rights of both alien parents or legal guardians

of minor children. Particularly, attention should be paid to immigration enforcement activities involving parents or legal guardians who are primary caretakers, safeguarding their parental rights, close quote.

The Supreme Court has stated that a basic right and an essential right is that of a parent to the custody of his children, and congress has manifested its intent regarding these cases. When congress appropriated Department of Homeland Security money, it indicated, quote, If detention is necessary, the report language encourages ICE to house family members together in known communal home-like environments until the conclusion of the immigration proceedings. That is the Congressional Record 152. It could be found at 2006 Westlaw 1594390.

Clearly, the interest of -- of the intent of congress is to keep these families together. In addition, the Flores Settlement Agreement provides an opportunity for release -- simultaneous release on an immigration bond for the parent and the child. And when that is not possible, congress has also manifested its intent. It has indicated, quote, and when detention of family units is necessary, the committee directs DHS to use appropriate detention space to house them together, close quote. And that is the Congressional Record 151,

1    and it could be found at 2005 Westlaw 1185446.

2         Keeping the families together is clearly the

3    intent of congress, and the government is violating the

4    law.  It's breaking the law.  It's not following the

5    law, and that implicates due process.  Why?  Because due

6    process applies to, quote, even those whose presence in

7    this country is unlawful, involuntary or transitory.

8    That is *Shaughnessy versus U.S.*, 345, U.S., 206, 1953.

9         The violation of due process occurs in two

10   ways.  First, it deprives these defendants for an

11   opportunity to go through the immigration process and

12   perhaps obtain asylum.  These defendants don't have any

13   prior record.  If they obtain asylum, all of a sudden,

14   they have a status here in the country, and a 1325

15   charge doesn't work because, all of a sudden, they have

16   legal presence in this country.

17        It also violates due process in a most serious

18   way because it's coercing these defendants to plead

19   guilty.  Can anybody doubt that these defendants want to

20   be with their children?  They're not going to want to go

21   to trial.  They want to get to them as soon as possible.

22   They left their countries with the most precious thing

23   they have, their children.

24        So this is a tactic to coerce the defendants to

25   plead -- to plead guilty.  But the law is clear when it

comes to pleas.  The law says that any plea that is the

product of coercion, either mental or physical, unfairly

obtained through ignorance, fears or inadvertence is not

good.  And that is *Kercheval versus U.S.*, 274, U.S.,

220, 1927.

This tactic either renders *Padilla* ineffective,

because my work under *Padilla* in the Supreme Court

decision, I need to advise them of the consequences

of -- of entering, the immigration consequences, but I

can't do anything about it.

In -- in a brief, we describe the government

conduct as outrageous, and the government is surprised.

Why is this outrageous?  Because it's breaking

congressional intent, it's not abiding by the -- by the

Flores Settlement Agreement, and they also have the

nerve to file a trial motion while a pretrial motion is

pending, the *Lafler Frye* hearing, which I would argue

could be constitute -- could constitute misconduct on

the part of the prosecution because we have a pretrial

motion pending, and that could be dispositive the *Lafler*

hearing -- *Frye* is something before we go to trial, so

we need to do that.  They are doing all these tactics

simply to obtain a conviction, a misdemeanor conviction.

I would argue that that is outrageous.

I would also argue that the prosecution of

these defendants is in bad faith in violation of due process. Why is it in bad faith? Well, because if these defendants were allowed to go through the immigration process, but for their 1325 charges, they could be in immigration, seeking the protections that they are probably entitled because these defendants don't have any prior record.

Now, the government files a response, and I'd just really like to address it for purposes of the record. This response is meritless. At page 9, they say "We don't cite any authority." Putting aside the fact that this is a novel issue of first impression in a criminal proceeding, the arguments that I'm raising, we cite the first -- the Fifth Amendment. Last time I checked, that was law and good law.

The problem from the government here is the Fifth Amendment, because if these clients plead guilty, they will face extreme hardship and will be prejudiced. They are going to be deported with no guarantee of ever seeing their children again.

So the government in their brief provides an alternative, let's go to trial. Well, that puts my clients in the same position. They are going to end up being deported. They are going to end up being convicted with a criminal record with no possibility, no

guarantee to see their kids again.

Furthermore, that doesn't address our position. We're arguing in our motion that we shouldn't even be here. These defendants should be in immigration court. So that doesn't take care of our motion.

THE COURT: Let me interrupt you briefly. So, I mean, your position, as I understand it, is that any possible immigration relief that they might be entitled to in, you know, citing the Flores Settlement and -- and any -- the possibility of either pursuing asylum claims, if that's what they wanted to do, or participating in the immigration proceedings of their -- of their kids, you're saying that that has to be a precursor to -- that that should happen before the government prosecutes? Because it seems to me the government has jurisdiction to prosecute these cases.

There's been an entry -- I mean, there's an alleged entry with -- their status is as aliens at the time of their entry or attempted entry. And so, jurisdictionally, I think they have the jurisdiction -- or it seems to me they have the jurisdiction to pursue these charges.

Is that your position --

MR. GARCIA: My --

THE COURT: -- that the immigration processes

1  that you're talking about should be -- should be dealt

2  with before they're ever even prosecuted?

3       MR. GARCIA:  Yes, because of all of the reasons

4  that I will briefly address, Judge, if you'll just let

5  me finish.  That is correct.

6       Let me just go back quickly -- and I'll address

7  those concerns in a minute.  But you're right, that's my

8  position.  But I tell you what, I haven't really told

9  you why that is necessary.

10      Going to trial is simply another mechanism to

11 strip these defendants of their rights that they might

12 have in an immigration proceeding, and it's also

13 stripping the children away from the children [sic]

14 because let's -- let's not forget that these children

15 want to be with their parents too.  We have a

16 seven-year-old kid involved in these cases.  And can

17 anybody doubt that he wants to go to -- he wants to be

18 with his parents?

19      So going to trial, to answer your question,

20 it's also a violation of due process.  Why?  Because we

21 are missing the most important thing, the material

22 witnesses, the children.  They don't have them here.  In

23 fact, they don't even list them in their complaints.

24 Why?  So even going to trial would be a violation of due

25 process.

1    The government is using a strong-arm approach

2 to coerce these defendants into pleading guilty, and the

3 [indiscernible] and red herrings.  For example, at

4 Footnote 3, they suggest that these guys may not even be

5 their real parents.  Well, if that was the case, the

6 government would not hesitate to bring felony charges

7 for trafficking minors.

8    At Footnote 8, they said that they are engaged

9 in criminal conduct.  Well, seeking asylum, escaping

10 violence from your country, that's not a government --

11 criminal conduct.

12    At page 11, they said that they are concerned

13 because Latinos engage in trafficking minors.  Well,

14 that is just stereotyping.  That's profiling.  Not every

15 Latino that crosses that border with a child is

16 trafficking minors.

17    At page 16 --

18    MS. FRANCO-GREGORY:  Your Honor, I'm going to

19 have to object to the defendants' counsel's

20 characterization of the government stating Latinos

21 traffic minors.  That is nowhere contained within the

22 response.

23    THE COURT:  All right.

24    MR. GARCIA:  If you look at page 11, Judge, and

25 you read it, you will make that decision.  They're

1  clearly referring to a concern, because at the south

2  border, the Latinos, and most importantly, Mexicans,

3  they engage in this kind of behavior.

4       At page 16, they say, well, you know what,

5  let's have them plead guilty and then we'll go through

6  all of our procedures, the Office of Refugee

7  Resettlement.  How about following procedure from the

8  get-going, and not separating these kids from -- from --

9  these parents from the children?

10       At page 16, they have the audacity to say they

11  are getting a $5,000 bond.  My clients are indigent.

12  They don't even have 5 cents, Judge.

13       And then they say, at page 15, the reason we

14  are doing that is because we are concerned they might go

15  to Mexico.  These guys are from Central America, from

16  Honduras and El Salvador.  Again, stereotyping, because

17  not every person with brown skin wants to go to Mexico.

18  These guys don't even have ties to Mexico --

19       At page 18, they suggest to you that they might

20  not even be in for purposes of due process.  Well, if

21  that is the case, I would argue that they are not in for

22  1325 purposes.  I argued that issue in the Fifth Circuit

23  recently in a 1326 case.

24       At page 18, they suggest, well, you know, if

25  this was a [indiscernible] defendants wouldn't even be

able to defend them.  Well, that's not true.  Minors

that sufficiently related, ancillary matters, the

statutes provides for -- for us to help these

defendants.  Not only that, Human Rights Watch, ACLU,

they are ready to help.

Congress has said -- the governments says that

they are concerned with policy.  Well, let's remind --

let's remind the justice department who does policy.

Congress, not the justice department.

But if they want to talk about policy -- and

I'm going to bring up [indiscernible] we're mentioning.

If we allow the government to use these 1325 charges,

they are rendering asylum and refugee law meaningless.

And most important, Judge, this is something

that I want you to take -- take note of this.  They are

using that mechanism to terminate parental rights, and

I'm going to tell you why.  Because these clients are

going to plead guilty, they are going to be deported,

and they are not guaranteeing to keep track of their

children.  We don't know what's going to happen.  And

that is terminating parental rights.  In this country,

even the most serious criminals have a right to due

process when terminating parental rights.

This is a big problem.  They are using,

actually, an asylum issue into a parental rights issue.

They are having these kids, and the -- and the clients
to face extreme hardship because [indiscernible] the
children.

In their complaints, they don't mention -- you
look at every -- every complaint here, every single
complaint, they don't mention the existence of the kids.
Why?  Because they are hiding it, right?  But my
understanding that today, maybe the press is here, and I
don't think they can hide that today.

Judge, in closing, I would like to say that,
lately, in the news, we have seen that the justice
department trumps the courts and congress, but that's
not the way it is.  Congress writes the laws, and the
courts apply the law.

William Shakespeare wrote in Hamlet, "Something
is rotten in the state of Denmark."  Well, something is
rotten in the Western District of Texas.  The act of
separating these parents from their children really
stinks.

For these reasons, I respectfully request you
grant the motion to dismiss.

Thank you, Judge.

THE COURT:  All right.  Thank you.

And the government wants to respond.

MR. RENNIE:  Yes, Your Honor.

1          THE COURT:  Sure.  Come on up, Mr. Rennie.

2          MR. RENNIE:  Your Honor, the government agrees

3   that the law should be upheld in this case.  The problem

4   for the defendants is that there is no legal basis for

5   the relief they are requesting in this context.

6          The relief they are requesting is completely

7   unprecedented and not supported by a Fifth Amendment or

8   any of the other legal authorities they are citing in

9   their motion.

10         THE COURT:  And just so that we're clear, the

11  relief we're talking about is the dismissal --

12         MR. RENNIE:  Yes, Your Honor.

13         THE COURT:  -- of the cases as a -- as a

14  sanction, essentially?

15         MR. RENNIE:  Yes.  And that's because this is a

16  criminal proceeding.  This is not an asylum case.  We

17  are here only on the criminal charges, not here to deal

18  with the immigration consequences of what they are

19  requesting.

20         This Court's jurisdiction is limited to those

21  criminal charges, and what's before the Court is whether

22  they can have any defenses to those charges, whether the

23  government has evidence to show that they indeed entered

24  illegally.

25         Whether they can obtain asylum at some future

date is not relevant.  It doesn't matter because they were still, by what appears to be their own admission in their filing, aliens to the United States when they were crossing.

And, you know, it's not a minor point that they were actually crossing at places that were not a port of entry.  If you come in and you're seeking asylum and fleeing violence, one way to do it would just be to walk up through the port of entry, and say, "Hey, I want to seek asylum.  I have problems.  I'm fleeing back home." That's not what they did here.  They were coming across the river at various different points along the border here in El Paso.

So even if they could obtain asylum at some point, that doesn't defeat the fact that they were aliens to the United States when they were crossing the border here.

Now, second, the remedy here is a trial.  You know, the idea that the defendants here are saying that a trial is not adequate or is somehow -- going to trial strips them of their rights, I believe defense counsel said.  A trial is their constitutional right.  That is their remedy in this situation when faced with a criminal charge.  So the idea that this is somehow not an adequate remedy is preposterous.

1    And the Fifth Circuit's case law makes it very

2  clear that, you know, if you had an involuntary plea,

3  even if they could establish that, their remedy would be

4  for that plea to be rendered invalid.  Then they could

5  go to trial.

6    THE COURT:  In a certain context, *Padilla* says

7  essentially that, right?  That at that point and

8  under -- under *Padilla*, because it was not a knowing

9  plea in that particular case -- excuse me.  Because it

10  wasn't a knowing plea, because he didn't know the

11  immigration consequences for that particular defendant,

12  basically, the remedy was that this is an invalid plea,

13  and you can go back to the table and renegotiate or have

14  a trial.

15    MR. RENNIE:  Exactly, Your Honor.

16    THE COURT:  Exactly, right?

17    MR. RENNIE:  Yes.  And the Fifth Circuit has

18  said that as well in a case -- a case we did cite, that

19  when there was a *Padilla* violation, that's the remedy,

20  that you go back.  The plea is rendered invalid.  The

21  defendant can then negotiate a new plea agreement or go

22  to trial.  That is the remedy in this situation.

23    And, you know, that is if you can establish

24  that a plea is involuntary or you are being coerced in

25  some way, which they haven't done here.  And -- and we

have cited extensively in our response, there are pages

of cases where the Fifth Circuit and other courts have

said these types of pressures related to family concerns

or even the government withholding some information is

not the type of thing that could render a plea

involuntary.  It has to be knowing and intentionally.

There has been no proof here that their ability to make

a plea has been overcome.  And, again, they haven't

actually pled guilty here is the main point.

And, you know, there has been a lot of talk

about due process and the Flores Settlement.  And all of

the -- the case law and the Flores Settlement itself,

these are also civil cases.  These are all civil

remedies in the context of their detention on criminal

charges.

Really, the only due process concern they have

is whether that is valid.  And we have a statutory basis

for that.  It's 18, USC, 3142.  The case law clearly

controls and says that detention in these circumstances

at a $5,000 bond is perfectly reasonable to the extent

that, you know, once they resolve their criminal cases,

they can bring whatever challenges they want in the

context of that immigration proceeding.  But that's not

why we're here.

The Flores Settlement itself, that concerns the

detention of juveniles. It doesn't say what the
government can or can't do in terms of charging
defendants with a 1325 criminal charge.

THE COURT: And, in fact, let me just interrupt
you briefly. You had a footnote in -- in the response
that you filed where you said -- because I -- I
requested as part of my briefing order that the
government basically -- I want to know what are the
policies on this, right? And so -- and you indicated
there's no statutory or regulatory authority that
compels the government to provide this -- just
information, and I -- generally, with regard to the
well-being or the location of -- of the defendant
parent's kids, there's no authority that compels the
government to do that. Correct?

MR. RENNIE: We did not find any such authority
in our research, Your Honor.

THE COURT: By the same token, is there any
authority that says that the government -- that it's
forbidden from providing that information?

Essentially, what I'm getting to is this: I
don't think there is something that forbids it, but I
think the government makes a policy decision that in the
context of defendants that are prosecuted for a 1325,
that it's -- they're not provided this information or

1  that there's not a policy in place.  Certainly, I don't

2  think you identified a policy with regard to this.  Is

3  that correct?

4        MR. RENNIE:  As far as I know, Your Honor.  But

5  I don't know that that is restricted just to 1325

6  defendants.

7        THE COURT:  Sure.

8        MR. RENNIE:  I think it's a more general ORR

9  policy, the Office of Refugee Resettlement, which had --

10  we -- any agency that has an unaccompanied child must

11  transfer that child to ORR, and I think it's their

12  general policy that they're very restricted on who they

13  give information to, understandably.

14        And as we noted in our brief, you know, there

15  have been many instances where individuals have been

16  attempting to enter or traffic children --

17        THE COURT:  Sure.

18        MR. RENNIE:  -- across the border.

19        THE COURT:  And it's clear that your office

20  prosecutes them.  I mean, there's no question.  And it's

21  really what -- what Mr. Garcia was saying, the

22  government pursues those cases and pursues them

23  aggressively.

24        I mean, but -- you know, we -- we handle -- and

25  just in the Western District, thousands of these 1325

1 cases, thousands. I probably -- I'm here five years.

2 I've probably done thousands of sentences, I think.

3 And so this is a newer phenomenon, in my

4 experience here, where, with Central Americans, there

5 are these unaccompanied children, but...

6 And, I mean, I get that point that you're

7 saying that there is no authority that compels you to do

8 it, but there's nothing that forbids you from doing it

9 either. I mean, and -- and -- but that's just --

10 basically, what I'm trying to get to is there is no --

11 no policy specific in -- specific to what information

12 parents get when -- when the parents are accompanied by

13 a minor and when the parents are prosecuted for some

14 immigration crime. There is none.

15 MR. RENNIE: I think ORR has some of their own

16 internal policies which governs how they give out

17 information. So to some extent, I think that may govern

18 the situation you're talking about.

19 THE COURT: All right.

20 MR. RENNIE: Because once they have the child,

21 they want to keep that information confidential.

22 THE COURT: And I'll tell you, just briefly,

23 something that confuses me is, so the parental rights

24 directive and -- and the government indicates, in your

25 response, that it's not really something that applies,

and it's, you know, something from a prior
administration that's kind of a legal relic, I guess,
but it's on the website.  I mean, and it -- it talks
about, in very strong terms, about how basically that --
that -- that ICE will strive to protect the rights of
parents in keeping them informed.

Even -- you know, even the ORR regs say that
when, you know, a child is transferred, I believe the
regulation states that, you know, parents are to be
informed about where they are, and I -- I just -- I
mean, we're getting a little bit apart from -- from kind
of the core issues here, which are the motion to dismiss
and the constitutional claims.  But in terms of that
policy, because I do think it affects -- or it can
affect -- I should say that -- it can affect issues with
regard to voluntariness, that it seems like there's
policies that Homeland Security has, ICE has, certainly,
that are still active policies.  They certainly don't
appear to have been rescinded.  The public can rely on
these websites -- on the ICE website and go to it and
read that parental rights directive.  But, I mean, I
think the government is essentially saying it doesn't
apply in a -- in a criminal case where somebody is
charged with a crime, where a parent -- a defendant
parent is charged with a crime and was accompanied by a

1  minor; and that, in either case, they can wait, and it

2  can be a process where they can wait up to six months

3  while their kids are in -- in immigration proceedings,

4  which basically doesn't really leave them the

5  opportunity to in any way participate in their

6  immigration proceedings while they are happening.

7       If their -- if they -- if the kids are in ORR

8  custody, they are in immigration proceedings, right?  I

9  mean, they are in immigration proceedings or deportation

10 proceedings of some sort or they are pursuing asylum

11 claims.

12       But by keeping the parents out of the loop

13 while their case is pending -- or while the criminal

14 case is pending, I mean, it doesn't -- the reality of

15 it -- it's the practical effect of it, I guess, is what

16 I'm saying is they're -- they're not participating in

17 any meaningful way -- in any way whatsoever in their

18 child's legal proceeding, which seems to run counter to

19 ICE's own policy regarding the parental directives

20 policy which even -- it's not as --

21       I mean, the government described it as -- what

22 was it? -- aspirational.  But really it does talk about,

23 you know, appointing a parental rights administrator

24 within the certain -- you know, within the districts.

25 There are other kind of substantive things and not just

1  a broad declaration of parental rights, although it does

2  that too.

3          So, I mean, that's really a little bit of the

4  confusion that I get, basically, of what -- what exactly

5  the government policies are.  Because in the absence --

6  it seems to me, in the absence of a specific policy to

7  have these parents that are being prosecuted involved in

8  a meaningful way in the immigration procedures -- in

9  immigration proceedings of their kids and just to know

10  their well-being and all these other things, I mean,

11  just to know how their kids are doing, that when they're

12  prosecuted, it's kind of a no man's land of information

13  in terms of their kids.  I mean, there is no policy.

14          And it -- the sense that I get is that the

15  government's default position is, in the absence of a

16  policy, the policy is no information.  And there's

17  nothing prohibiting us, but there's no information for

18  the parents while the criminal case is pending.  And

19  that's -- that gives me a little bit of -- I have a

20  little trouble with that, okay?

21          Now, and I'll -- I'll concede this, it is

22  separate from -- it, in some sense, from the remedies

23  issue, which is really what we've been talking about

24  this morning, what the legal remedies are.

25          But anyways, I don't know if there's anything

in there that you want to address or if I have misstated

something, but that's just -- that's just something that

I wanted to get out -- get out there, just so you know

what I'm looking at.

MR. RENNIE:  I understand, Your Honor.

The problem with, I think, what you're saying

is that I don't think that they're situation is that

much different from anyone who has been detained on

criminal charges, any arrestee.

Your liberty interests are necessarily going to

be restricted if you are in jail because you're facing a

criminal charge.  And to the extent that they can -- the

facility that they're in allows them to pursue ORR's

procedures in order to try to obtain more information,

they can do that.

But they probably -- in a practical sense,

you're correct.  They don't have the same ability to do

so because they are facing criminal charges.  So --

THE COURT:  And let me say, the ORR's own

website -- sorry for interrupting.  But the ORR's own

website says, you know, look into -- their information

that they provide is, "We might be able to get a

message.  If you're a parent and you're concerned, we

might be able to get a -- basically, a one-way message

to the child," and that's about it.

1        And I don't even know how that 1-800 number

2   that's provided -- and I know we -- we've handled a lot

3   of these cases in this court, Mr. Rennie, when you've

4   been here, and when I've asked about this, "Well, the

5   Border Patrol sometimes, pursuant to ORR regs, provide a

6   1-800 number in -- in English and in Spanish to -- to

7   the defendants," and that's basically it.  I don't -- I

8   don't know what other information they're given about

9   that.  I mean, that's -- that's really kind of an

10  evidentiary thing, but that's been my sense when I've

11  asked here in court.

12       But, look, I'm going to let you get back to it,

13  but I wanted to raise those issues.

14       MR. RENNIE:  I understand, Your Honor.

15       And I think in some of these cases, they --

16  they're -- they did provide that -- that number at

17  least --

18       THE COURT:  Right.  I think so too.

19       MR. RENNIE:  -- to the defendants.

20       I will also point out that the policy on the

21  website that you were talking about, it does explicitly

22  state that it may not be relied upon to create any right

23  or benefit, substantive or procedural, enforceable by

24  law by any party in any administrative, civil or

25  criminal matter.  So it is, on its on face, restricted

in -- in what it does going forward.

THE COURT: And I think even the Flores
Settlement has a disclaimer like that.

MR. RENNIE: Yes. Yes, Your Honor.

And, specifically, with respect to the Flores
Settlement, there are, I believe, the Western District
of Texas, itself, has held that it doesn't
[indiscernible] parental rights. And I think the Ninth
Circuit also followed that authority in making a similar
finding.

As -- as far as due process goes, Your Honor,
again, to the extent that, you know, they have parental
rights, assuming that they are the parents -- and the
government doesn't necessarily know is another big point
here, is, you know, when you have people coming across
the Rio Grande River with children, you don't
necessarily know that this person is the child's parent,
even though they may say that. It's -- and it's very
difficult to confirm that type of information in this
type of circumstance, which is the point we were making
in our brief.

THE COURT: Yeah.

MR. RENNIE: So the other point is that the
fact that they're claiming parental rights, and I don't
know whether they have -- I can't advise them as far as

whether they have some due process right to a parental

right in this circumstance, but as far as being confined

in -- on criminal charges, that doesn't change the fact

that that is adequate and constitutional. And the

United States Supreme Court has upheld that statute that

allows their detention in *United States versus*

*Salerno*.

THE COURT: Right.

MR. RENNIE: Now, responding to some of

these -- these other points, you know, as I was saying,

defendant was saying that the law is clear that the

Flores Settlement is being violated and says they cannot

be separated. That's not what it says. And all of

these -- even the policy that we're talking about

before, these are talking about immigration detention.

They're not talking about criminal defendants who have

been charged with illegally entering the country.

And some of the other policies that the defense

was citing, these are statements from a floor speaker of

a single legislator on some appropriations acts.

They're not -- they don't necessarily represent the will

of congress in the same manner that defense counsel is

suggesting.

Can I just have a moment, Your Honor?

THE COURT: Of course.

```
1        MR. RENNIE:  Thanks.

2        Your Honor, just a couple more quick points.

3        THE COURT:  Yes, sir.

4        MR. RENNIE:  You know, co-counsel points out to

5   me that one of the key points behind the Flores

6   Settlement was to allow for unaccompanied children to be

7   released to other adults.  It's not necessarily

8   something that requires them only to be released to a

9   parent.  It was something that was designed for the

10  betterment of those unaccompanied children.  And my

11  understanding is that is what ORR tries to do in these

12  situations.

13       I'm also -- co-counsel also pointed out that

14  there is a regulation, 8, CFR, Section 236.3, Subsection

15  F, which requires notice to parents concerning juveniles

16  in detention in some circumstances.

17       THE COURT:  Uh-huh.

18       MR. RENNIE:  And our point regarding that is

19  that this doesn't really change regarding whether the --

20  the parent is being detained on criminal charges or

21  not.

22       THE COURT:  Okay.

23       MR. RENNIE:  So it really just goes back to

24  that main point of, you know, if they're being

25  detained -- their liberty is necessarily restricted if
```

they're being detained on criminal charges.

And, Your Honor, in conclusion, we would just stress that, you know, this is not an asylum proceeding. It's not an immigration proceeding. There are ways to seek asylum without getting charged with illegal reentry.

And the defendants here, among some of the other ones that we've dealt with in the past few months, made a choice, and they decided to cross the river the way they did, not come up through the port of entry, and that's the reason why they're facing criminal charges now, and that's how we find ourselves in this situation.

And so, in conclusion, I would point out that this is not something covered by the Court's jurisdiction on criminal charges, and there's no basis for dismissal in this case or any of these cases. Any relief they would be entitled to would just simply be to have an involuntary plea vacated.

THE COURT: And -- and I think your -- your -- your response, the -- the brief, talks about you believe the remedies in this case -- if there is no constitutional issue, the remedy is really just to make sure -- and -- and you don't disagree that the remedy is to explore the voluntariness of the pleas, number one, and -- and to really get into that issue, basically, as

1  part of a trial-rights-type argument, that -- that the

2  Court can get into that.

3  And there is case law that says, when the Court

4  has some concern or is aware of a particular issue --

5  like, let's say, if somebody -- if there was a mental

6  competency hearing, and they were found competent, but

7  the Court has concerns about mental health, I mean,

8  basically there's no litany.  We don't -- we don't

9  follow -- we have little scripts that we follow for our

10  pleas, but on something like that, we can absolute --

11  we're required -- I think the judicial office is

12  required to delve into that issue, develop that issue to

13  make sure that there is not something else at play here,

14  and that the plea is voluntary, and they're pleading

15  guilty because they are guilty and for no other reason.

16  I mean, that's essentially what you're saying,

17  that that's basically the avenue we would need to follow

18  here.  Is that correct?

19  MR. RENNIE:  We agree that you have discretion

20  to inquire into those subjects, Your Honor, as part of

21  the plea colloquy.

22  But as we've stated our view of the law, our

23  general -- our position is that those types of concerns

24  have not been found to render a plea involuntary.

25  THE COURT:  All right.  Well, and I don't know

1  that I agree with that necessarily or not.  I know you

2  briefed that issue, but I think it is something that a

3  court certainly is required to get into on the record.

4          Again, the sense -- I just want to make sure

5  I'm clear on this.  The sense that I get -- that I got

6  from the response and what you're saying today is that,

7  once this proceeding is over -- and these are petty

8  offenses.  These are pretty much the lowest type of --

9  or least-severe type of federal offenses that can be

10  charged -- that once this proceeding -- this procedure

11  for the defendants is over, that they're free to pursue

12  whatever immigration relief they -- they think they need

13  to proceed or they feel they need to proceed.  Is that

14  correct?

15          MR. RENNIE:  Yes.  That's our understanding,

16  Your Honor.

17          THE COURT:  Okay.

18          MR. RENNIE:  Yes.

19          THE COURT:  And go ahead.  I'm sorry.

20          MR. RENNIE:  No.  Please continue.

21          THE COURT:  What I was going to say was, but

22  that's -- that's their immigration proceeding.  But

23  meanwhile, you have their children's immigration

24  proceeding, and your view is that while -- I mean, I

25  think the practical effect of what you're suggesting

might be that they don't have a right to be involved.
Notwithstanding the parental rights directive, they
don't have a right to be involved.  Basically, that any
involvement they might have in their children's
immigration proceeding is stayed while this criminal
matter is pending, which can be up to six months.  I
mean, that's the practical effect of it.

I don't see how meaningfully they can
participate, and the best they can do under the ORR
regulations is to maybe send off a one-way message that
some person at a call center at ORR says, "We'll get the
message to your child."  I mean, I don't know how else
they meaningfully participate in their child's
immigration proceedings.  And they're in immigration
proceedings.

MR. RENNIE:  I understand what you're saying,
Your Honor.  But our position is that it's not stayed.
They -- they can participate to the extent that any
criminal defendant who is being detained could
participate in that type of situation.  I'm sure it's
easier to do so once they are out of criminal detention.

But I don't see how that's different from any
other criminal defendant who has family issues or other
civil problems that they are facing.

THE COURT:  No question -- no question.  Once

1    your liberty is restricted, you are restricted from

2    doing that.  You know, my sense is just -- you know, in

3    state court, if you had those kinds of issues, CPS is

4    involved, and there's --

5         I mean, some of those parents have rights to

6    visitation, basically, until some court of competent

7    jurisdiction or some tribunal of competent jurisdiction

8    makes a determination that they no longer have parental

9    rights.  They have parental rights, even for somebody

10   charged with the most serious crime under the Texas

11   Penal Code.  And I'm just using that by way of example.

12        But I just -- the -- let me just say this, and

13   I appreciate your comments this morning.  An issue that

14   I -- that I have is that they're really, as a practical

15   matter, there's no meaningful way for these parents to

16   know anything about their kids.

17        I -- I just don't see it even with the ORR regs

18   that -- you know, the handout that they get sometimes --

19   we've seen it in court.  I mean, basically, which is

20   what's on the web page.  It gives the opportunity for a

21   message.  It doesn't provide for a communication between

22   the two.  It doesn't provide them the opportunity to

23   participate in -- in the immigration proceedings that

24   their kids are going through.  And so, you know, that --

25   that's -- that's just something that has troubled me

from the get-go.

You know, we -- we get questions in these -- in these immigration 1325 proceedings, you know. Do the defendants have anything to say before we impose sentence? And we go through that very frequently. And you may have been here for some of these, I think, where, "Well, what about my property? What about my IDs?" And, you know, I know -- I know that the Border Patrol has very detailed policies -- I know because I've seen them -- detailed policies about the return of property. And I'm going to tell you, and I will say it right now, I mean, they do a very, very commendable job of getting that property back to defendants.

I mean, you know, I -- I -- I mean, I can say that just because I've had these discussions with Border Patrol people, you know, sometimes they might return 60 packages of property, clothing and backpacks and, you know, personal effects and other things. They'll return back, work closely with the Mexican consulate in the case of defendants who are Mexican nationals. And so we have these detailed policies, and they do a great job of -- of doing that.

I just -- it just surprises me that, in this matter, where it involves something that is paramount important to any parent, okay -- and notwithstanding the

1  concerns of the government with, you know, combating the

2  exploit- -- exploitation of children.  I mean, I think

3  they take these matters extremely seriously.  You

4  prosecute them seriously.  But -- I mean, that's not all

5  the cases, certainly.  I mean, that is -- that is part

6  of -- that's something that happens.

7          But, I mean, I think where somebody has a

8  legitimate concern about their kids, it just -- it

9  really surprises me that there is no policy

10  regarding providing some of that minimal information.

11          I believe that the constitution says you have a

12  fundamental right to familial association, and the bare

13  minimum application of that right, in my opinion, would

14  be the providing of some information regarding the

15  well-being of -- of the defendant's children or even

16  providing for some communication.

17          And that's not me just saying that, that's

18  ICE's parental directives from 2013 saying that, which

19  is not a policy that has been rescinded, which is still

20  on their website.

21          And so just so you understand that that's --

22  that's an issue that gives me some concern.

23          All right.  And I appreciate your comments.

24  I'm going to take -- I'm going to take just a very brief

25  recess, about two minutes.

1          Chris, let me visit with you.

2          And we're in recess.

3          (Recess taken from 10:21 a.m. to 10:23 a.m.)

4          THE COURT:  All right.

5          MR. GARCIA:  Judge, before we get going --

6          THE COURT:  Yes, sir.

7          MR. GARCIA:  -- do you think I could have 30

8    seconds just to clarify one statement that was made?

9          THE COURT:  That's fine.

10          MR. GARCIA:  I think it's important for the

11   record.

12          One of the statements that was made by the --

13   by the government is that, you know, they have access to

14   this information, they can check the Internet.  We have

15   Ms. Zavala right here.  Ms. Zavala -- make sure I get

16   Zavala-Zavala, Natividad Zavala, can't even write or

17   speak.  She had to sign with an X.  I had to tell her

18   how to sign.  How is she going to check all this

19   information and dial numbers?

20          And just briefly, the last -- the last -- the

21   last comment, the congressional -- congress intended for

22   these kids to be placed with relatives, that could not

23   have been the intent, because in the case of Ms. Elba

24   Luz Dominguez-Portillo, she has no family.  There's no

25   relatives.  And like you said, she has no meaningful

1   participation in her child's proceedings right now, as

2   we speak.

3       So I just wanted to make sure that we clarify

4   that for the record.  Thank you, Judge.

5       THE COURT:  I appreciate that.

6       And, you know, and I -- I will note, just --

7   you know, we had a situation, and I -- I -- I cannot

8   remember the defendant's name, but he was a speaker of

9   an indigenous language from -- he may have actually been

10  from Mexico is my recollection, from Mexico.  But in any

11  case, he was not a Spanish speaker.  I mean, he was

12  provided the 1-800 number.  I don't know what good that

13  1-800 number does in that circumstance at all.  I mean,

14  there's -- you know, these very kind of obscure

15  languages here in the United States, so...

16      All right.  I'm sorry.  You were -- was there

17  anything you wanted to add?

18      MS. FRANCO-GREGORY:  Your Honor, if I may.

19      THE COURT:  Yes, of course.

20      MS. FRANCO-GREGORY:  I need to address certain

21  issues.

22      The -- the hearing -- and I appreciate -- thank

23  the Judge for allowing me to address the Court.

24      THE COURT:  Uh-huh.

25      MS. FRANCO-GREGORY:  The hearing seems to

1  have -- to have addressed many different issues.

2          THE COURT:  Uh-huh.

3          MS. FRANCO-GREGORY:  And the Court, along with

4  defense counsel, have made statements regarding policy,

5  procedures, statements made by HSI.  And just from a

6  general standpoint, Your Honor, the government would

7  reiterate that these cases have been prosecuted for

8  many, many years.  There has been no policy change

9  within the department.

10          THE COURT:  Uh-huh.

11          MS. FRANCO-GREGORY:  The government has always

12  prosecuted individuals who have illegally entered the

13  United States.

14          THE COURT:  Uh-huh.

15          MS. FRANCO-GREGORY:  These cases are

16  misdemeanor cases, and as the Court well knows, often

17  these defendants are sentenced to a time of time

18  served.

19          THE COURT:  Uh-huh.

20          MS. FRANCO-GREGORY:  Unfortunately, these

21  defendants have been in custody nearly five weeks due to

22  the pending litigation.

23          The -- the government would offer that their

24  parental rights are not being terminated.  That has

25  never been the contention.  The thousands of cases that

have been presented to this Court, their -- their

parental rights have never been terminated, Your Honor.

Indeed, as the Court well knows and as defense

counsel well knows, there are situations where children

are trafficked. The government and the Western District

of Texas deals with a high volume of cases. As the

Court noted, thousands of cases come through this

Court.

THE COURT: Right.

MS. FRANCO-GREGORY: There is a method that we

have to triage these cases.

These defendants have been charged with

misdemeanor offenses. Our brief outlines in detail that

they could potentially face felony alien smuggling

charges. The inquiries that have been made of them only

adds to the evidence that supports a felony charge of

alien smuggling.

However, in this instance, the government has

decided to go with misdemeanor charges based on certain

factors that are well within the prosecution's

discretion.

Your Honor, the ORR must safeguard the safety

of those children. And for defense counsel to expect

that their clients will be provided that information,

that that is part of the criminal process, leads to --

1   as outlined in our brief, Your Honor, the further

2   trafficking of children.

3          The Court has heard, defense counsel knows,

4   that alien smuggling organizations specifically advise

5   aliens to enter the United States with children in hopes

6   that they will avoid prosecution and avoid immigration

7   consequences.

8          Your Honor, the -- the procedures are in place.

9   They're there for ORR to safeguard those children, to

10  ensure that they do go back to a parent or to a

11  relative.  They're not there to terminate the children's

12  right.  The -- the main goal is so that these -- the

13  well-being of the defendant's -- of the children is

14  maintained.

15         Furthermore, Your Honor, the defense has gone

16  into great length about their children and how their

17  parental rights are being terminated, yet defense has

18  offered no proof whatsoever that these are their

19  children.

20         I'm not sure what -- what the purpose of the

21  extent of his argument was, Your Honor.  I would

22  reiterate on the record, Your Honor, that the government

23  was ready to go forth on Wednesday, and the defense --

24  defendants had to sit in jail over the weekend because

25  defense counsel was not ready.

1          It's an interesting note that defense counsel

2     notes that the press is in the courtroom today.

3          So I -- I just wanted to make those arguments

4     known, Your Honor.  And, of course, I'm not disparaging

5     the Court whatsoever, but I wanted the Court to know

6     that -- that the policy has never changed, Your Honor.

7          THE COURT:  I understand.  I -- I go back to

8     this issue, though.  I mean, and I -- I know that the

9     government takes the position that the regulations

10     governing the Office of Refugee Resettlement and the

11     placement of children that -- that policies are made

12     to -- to basically determine what's in the -- that those

13     policies were enacted to determine what's in the best

14     interest of the children.

15          The flipside of that, though, is that, I mean,

16     the government doesn't -- it has a policy.  It talks

17     about parental rights, about how parents need to be

18     involved in their -- in a broad sense, that they have --

19     unquestionably, that there are parental rights.

20          And I -- I just don't see how that declaration

21     by the government -- and it's a policy that they can

22     take off their website.  They can rescind tomorrow, if

23     they wish.  It's still on there.  Then the public can

24     rely on it.

25          I mean, what -- what -- let -- let me just

finish.

What meaningful rights a parent would have, I mean, I don't think it's -- *Padilla* tells us that your immigration -- the immigration consequences of a plea of guilty can be a critical factor in determining the voluntariness of your plea. It is not that much more of a stretch to say that the immigration consequences of your -- to your minor children -- to your minor children, how that might be a factor. And as a practical matter, it may be the single most important factor that you're considering if you're a defendant, and -- and if you're a defendant charged with these offenses, and it may be the number one thing you want to do.

And so a troubling part of this is that part of your motivation would be, since I have no information right now, I have no way of getting any information right now, getting out of here and getting done with my case may be -- as soon as possible may be the best option that I have to try to get involved with my child's immigration status. At this point, they don't know whether they are going to get deported before, after or at the same time as their kids.

And -- and that is -- if -- if you were in the defendant's shoes, that would be a consideration. I

don't think there's any doubt about that, that that may

be the single most important consideration you have in

trying to make a determination about your own criminal

case, whether you plead guilty or whether you have a

trial.  So anyways.

MS. FRANCO-GREGORY:  Your Honor, there is no

evidence on the record to support any of those

contentions made by these defendants.  Indeed, I would

reiterate that there is no evidence on the record

supporting that those minors that were traveling with

those defendants are even their children.  Those are a

lot of conclusions that have been made, but these

defendants have never had the opportunity to address

that on the record.

THE COURT:  Okay.  And how does the government

allow for a defendant to make that showing, then, in

order to get some of this information?

MS. FRANCO-GREGORY:  Your Honor, the government

would rely again on the brief.  That is not -- as the

Court stated, the Court may go into that issue --

THE COURT:  Uh-huh.

MS. FRANCO-GREGORY:  -- at the plea hearing,

but the remedy is a trial.  The remedy is not a

dismissal of the case.

And -- and that is really one of the

government's prime concerns is that a lot of assumptions
have been made on behalf of these defendants, yet they
have never had the opportunity to address the Court and
put in the record in their own words their concerns.

        And, again, there is no evidence supporting
that the children that they were traveling with are
indeed their children.  And, again, the safeguards
implemented by ORR are to protect those children, to
ensure that they were not being trafficked, and that
indeed those are their children.

        So we're making a lot of assumptions.  Yet,
there is no evidence to support those allegations.

        THE COURT:  And -- and let me just say this:
Let's say -- let's assume for the sake of argument that
a defendant wanted to make a showing.  I mean, there has
to be some mechanism for them to make a showing that
they're the parent, I mean.

        And -- and so I just -- what I'm having trouble
with is getting a one-way message to the child.  Is
that -- is that consistent with a constitutional concept
of familial relation -- of -- yeah, familial
relationships, basically, your parental rights?  Just
basically not being in communication with your child.  I
mean, that's what I'm troubled with.

        MS. FRANCO-GREGORY:  But -- but, Your Honor --

1          THE COURT:  Setting aside the evidentiary

2   issues, which, you know, you've raised and I

3   understand.

4          MS. FRANCO-GREGORY:  But, Your Honor, the

5   assumption there is that there is -- that these are the

6   parents with no evidence to support that they are the

7   parents.

8          THE COURT:  So the government's default is that

9   they're not the parents?

10          MS. FRANCO-GREGORY:  No, Your Honor.  But --

11   and, again, we're going so far away from -- from the

12   issues at hand, which is a criminal prosecution of a

13   misdemeanor illegal entry into the United States.  And

14   the government would re-urge what is contained within

15   the brief, that the issue as far as providing them

16   notice as to the status of the child that they were

17   accompanied with is not ripe at this time.

18          THE COURT:  All right.

19          MS. FRANCO-GREGORY:  And so, again, the issue

20   of establishing whether they're not parents or they are

21   parents is not a matter before the Court.  And so the

22   government would rely on that argument and also stress

23   that there is no evidence at this point supporting that

24   they are indeed the parents of those children, and,

25   again, stressing how the government outlined in its

brief there are many instances, including misdemeanor
cases, where children are brought in with aliens in the
hopes of not being prosecuted criminally or are facing
immigration consequences.

THE COURT:  And the government has said that
repeatedly, but I'm sure there's many cases where that's
not the case.

And so, I mean, what -- what is the
government -- I'll just ask you if you know.  But at
what point do the parents get to find out anything about
their kid's case?

I mean, they may be sitting here -- and, again
you've have raised these evidence issues, which I don't
think are -- I mean, which I think are -- are
legitimate.  But I'll tell you this, I mean, if you're
making a decision about processing your own case and
trying to figure out whether you're going to plead
guilty or not, I mean, at what point do you get to find
out, according to government policy, if you happen to
know, when -- whether you are going to be deported at
the same time as your child or before or after or when
will they put them in touch?

I mean, they're here with minors.  And if they
process these cases, and they go over -- I'm talking
about practical things here.  They -- if they plead

guilty here and they go over to the camp, at what point

do they get to find out anything about their kids?

So I don't think there is a mechanism in place

for the government. The government is tell -- telling

me -- tells me in their brief they are not compelled to

do that. But they're not forbidden from doing it

either.

It's -- I -- again, and I go -- I go to this,

as a practical consideration and up here as somebody

that has to make a determination on voluntariness of

pleas, just not knowing anything about the kids, yes, it

could be a factor. I think it could be a factor that,

if I was in their shoes, I'd be concerned about where my

kids were also.

So, in any case, I'll just -- I'll just leave

it at that.

MR. GARCIA: Judge -- Judge, I --

THE COURT: I -- I think -- I'm going to just

cut it off here.

Is there anything else, Ms. Franco?

MS. FRANCO-GREGORY: No, Your Honor. Just that

this is a misdemeanor 1325 case, the government

establishing whether or not their parents is not an

element of this offense.

MR. GARCIA: Judge, and you can overrule me on

the record if you want to, but I was -- I feel that the

comments of having two lawyers argue, I think at least

I'm entitled to clarify a couple of things that Ms.

Gregory said.

THE COURT:  I appreciate it.  I think we've

heard enough argument.  At least the Court has.

Here is what the Court is going to do, okay?

I've heard these arguments.  You've heard some of the

concerns that I have.

In terms of the relief that the defendants are

requesting, okay -- this is a motion to dismiss alleging

constitutional violations -- I am -- I am going to deny

the defendant's motion to dismiss, okay?  I will issue

an order explaining my reasons, but I am going to deny

the motion to dismiss.

I don't disagree with the government that some

of these issues are issues that are definitely within

the purview of the Court, in terms of any possible

*Padilla* implications, but certainly under Rule 11 of the

Federal Rules of Criminal Procedure involving --

regarding the voluntariness of a plea, that those are

things that I can consider.  But I am -- I am denying

the motion.

Did you --

MR. GARCIA:  Yes.  I want to object to the

ruling pending an appeal in the district court.

THE COURT:  Yes, sir.

MR. GARCIA:  So I would like you to, please,
allow us to -- to -- to stay the proceedings at least
until I file an appeal.  I probably could file it today,
but I intend to file this with the district court.

THE COURT:  Okay.  Now, here's my -- the
problem is this:  I'm not going to have an order on this
explaining basically the reason for my ruling.  I'm not
going to have an order on this for, let's say, by the
end of the week or early next week.

The issue is this.  Let me ask you this
question:  Because we do have the pending matter of
this -- of the plea offer that the government wants to
put on the record, my question to you is -- and I
don't -- I'll leave it to you -- but I don't know
whether it affects your appellate rights or not, but do
you want to address the issue of whether your clients
want to be rearraigned on this issue or -- or whether
you want to proceed to trial on these?

Basically, here is what I'm going to do:  If
your clients want to enter a plead -- a plea and change
their plea today, I don't know whether that necessarily
affects your appellate rights, which --

MR. GARCIA:  Yeah.  I would rather just hold on

1 and let me file my appeal because I believe that the

2 district court might -- may -- may decide otherwise.

3 And if that's the case, then -- then -- then the motion

4 to dismiss is -- is dispositive.

5       Judge, and I know we're establishing a record

6 here, but now that you have denied my motion, you at

7 least need to let me clarify a couple of things, just

8 for purpose of the record, because I'm going to request

9 a transcript.

10       THE COURT:  That's fine.

11       MR. GARCIA:  And this transcript is going to be

12 used.

13       Ms. Gregory stood up here and told me --

14       THE COURT:  Do you want to come up to the

15 podium?

16       MR. GARCIA:  Sure.

17       Ms. Gregory stood up here and told you that,

18 you know, this could be alien smuggling -- trafficking

19 matter cases.  Well, that's not the case.

20       MS. FRANCO-GREGORY:  Your Honor, I object.

21 That's alien smuggling.

22       MR. GARCIA:  Judge, this --

23       THE COURT:  I'm sorry?

24       MR. GARCIA:  -- this is -- this is a pretrial

25 matter.

1    MS. FRANCO-GREGORY:  It's alien smuggling, for

2  purposes of the record.  I did not say trafficking of

3  minors.

4    MR. GARCIA:  Well, alien smuggling.

5    Well, that's not the case.  If that was the

6  case, they would not hesitate to charge them with that,

7  and the reason why they can't charge them is because

8  they would have the burden to prove that that is the

9  case.

10    Second of all, she said that we weren't ready

11  last Wednesday.  Let me remind Ms. Gregory on the record

12  that, you know, the clients -- the five clients were in

13  three different federal prisons, and they had to be

14  gathered, and they were not gathered until late in the

15  afternoon on Monday.  That's why we requested the --

16  the -- this short continuance.

17    And last, Judge, she stood up here telling you

18  these are misdemeanor cases, that they -- that she's

19  concerned with this -- with the well-being of my

20  clients.  That's disingenuous.  And it's disingenuous

21  because if she was truly concerned, she would not

22  separate them from their children.  We don't even

23  separate puppies from a dog, Judge.

24    So based on those issues, I think it's an error

25  to deny the motion to dismiss --

THE COURT:  Of course.

MR. GARCIA:  -- and we would like to request,
based on the fact that the clients are facing extreme
prejudice and -- and hardship, an opportunity to stay
the proceedings so that we can file an appeal.

I will inform the Court if -- if the decision
of my clients change, but I would like to have an
opportunity so that I can confer with them, and in the
meantime, stay the proceedings.

THE COURT:  Will you file a motion staying
the -- or file -- will you be filing something with the
Court staying the proceedings, giving me authority to do
so, or -- or indicating to me what my authority is to do
so?

MR. GARCIA:  Well, I -- I could do so, Judge.
I -- I -- I certainly can do that.

THE COURT:  I'm making that request.

MR. GARCIA:  Okay.  Sounds good.

THE COURT:  If you -- if you could do that and
give the government the opportunity to file a
response.

Now, and at this time -- go ahead, Ms. Franco.

MS. FRANCO-GREGORY:  Your Honor, we have the
trial setting on Friday.  And so the government would
just offer that the impact of the plea offer that is

```
1   made to the defendants is diminished every day.

2           THE COURT:  Uh-huh.

3           MS. FRANCO-GREGORY:  And I -- I would ask,

4   reiterate again that these defendants at least have the

5   opportunity to address the Court, and make certain that

6   defense counsel has apprised them of the plea offer we

7   made on November the 9th.

8           THE COURT:  I think -- so we had that matter

9   pending.  When I first -- I first saw a motion, which I

10  granted, which the government just basically would be

11  putting their -- the plea offer on the record, and the

12  defendants on the record would indicate whether or not

13  they were accepting or rejecting the plea offer.

14          MR. GARCIA:  Once we're done with the pretrial

15  matters, yes, Judge, I guess, at that point, we get to

16  that -- to the *Lafler* motion, yes, that probably would

17  be the case.

18          THE COURT:  But what about now?

19          MR. GARCIA:  Not right now, Judge.  I would

20  like an opportunity to get -- to file an appeal.  I'm

21  still dealing with a pretrial matter, which is the --

22  the motion to dismiss.  If that motion is granted -- and

23  I'm not sure, I'd have to check to see if I could

24  plea -- if I could file an interlocutory appeal.  But if

25  that -- it is granted, then it's dispositive, and
```

1  this -- my clients will find the relief that we're

2  seeking, so...

3          THE COURT:  But -- but -- okay.  I'm trying to

4  understand.  A *Lafler Frye* hearing is basically to allow

5  to put on the record that a plea offer has been made and

6  the substance of that offer.  And your clients would, on

7  the record, say whether or not they were accepting or

8  rejecting this offer.

9          MR. GARCIA:  Yes.  I guess -- I guess that

10  would be the case, once we get done with the resolution

11  of the motion to dismiss.  If the -- if the -- if the

12  district court is denying my appeal or if my clients

13  want -- want to plea, then obviously we'll address

14  that.

15          THE COURT:  So you're saying it's untimely, I

16  mean, to --

17          MR. GARCIA:  It's untimely, Judge.  It's a

18  mechanism to bypass.  There is no restriction on speedy

19  trial just because -- if you look at the -- at the -- at

20  the definition --

21          THE COURT:  Well, it's your motion.

22          MR. GARCIA:  Yeah, exactly.

23          THE COURT:  There's no speedy trial issue

24  now.

25          MR. GARCIA:  There is no -- there is no issues

there.

So I would like an opportunity to -- to -- this is a very important issue, Judge. It's -- it's going all across the nation. It's -- it's -- it's a matter of first impression, and I would like to request an opportunity so that I could file the appeal.

And while I do that, I will also talk to my clients. If they change their mind and they want to proceed otherwise, I'm sure they will inform me and I will inform the Court. But I'd like to have the opportunity to, at least, to -- to file that appeal, and to confer with my clients and explain to them what just happened.

MS. FRANCO-GREGORY: And, Your Honor, the trial setting is set for Friday. The government -- again, the plea offer is diminished each day. The trial setting hasn't gone away.

THE COURT: What do you mean that, that it's diminished?

MS. FRANCO-GREGORY: So the offer that we made to the defendants, the impact of that plea is diminished the closer we get to trial.

MR. GARCIA: Right. Without getting to the merits of -- of what Ms. Gregory is talking, okay, without getting to the merits, Judge, let me just point

out one thing.  These plea agreements are nothing but a

legal fiction, and I'm going to tell you why.  Because

there is no judge -- and I clerk for six different

judges all across the nation.  There is no judge that

would sentence these misdemeanor defendants to anything

other than time served, okay?

　　　　The fact that she -- the fact that she is

offering this plea agreements, it doesn't make the

penalty harsher for my clients, Judge.

　　　　THE COURT:  Look, the point is whether the

government has the right to put that offer on the

record, and that your clients can accept or reject it at

that time, okay -- at that time.

　　　　Given my decision this morning, given the fact

that you'll be filing a motion to stay, I guess, pending

whatever appeal you're -- you're -- you will be

pursuing --

　　　　MR. GARCIA:  Because I don't want to waive any

issues, Judge.  I waited -- I need to make sure that a

procedure is correctly, because even if one client

decides to go with this, you know, I don't want to have

any waivers.  The Fifth Circuit is very strict on

waivers.  So that's why I'm asking you for an

opportunity so that I can file the -- the -- what you

request, to stay the proceedings, and so that I can file

1    an appeal, because, you know, I'm concerned with waiving

2    issues.

3            So I can't -- I can't go ahead with the *Lafler*

4    *Frye* hearing, and then the Fifth Circuit constitutes

5    that as a waiver.  I can't do that.

6            THE COURT:  All right.  Look, I had granted it

7    just to get the -- just to get that offer on the record.

8    If you're saying that it's premature to do that, I mean,

9    you can -- you can brief that.  You can brief that, and,

10   I mean --

11           MR. GARCIA:  Well, it's a pretrial matter,

12   Judge, and pretrial matters are dealt with before we get

13   to the trial matters, which is -- you know, the *Lafler*

14   *Frye* hearing is a matter just before a trial.

15           THE COURT:  Look, I understand the concerns

16   that you're raising, okay?  That you don't -- you're

17   concerned about any waivers your clients might be making

18   in light of a -- in light of the fact that they'll be

19   appealing this decision.

20           The question is whether this is something that

21   the -- does the government have the right to put this --

22   this on the record right now?  I mean, I have granted

23   this.  I understand your concerns, but I would like you

24   to raise them.

25           But my inclination is to have a hearing at

1  which this plea offer is conveyed to your clients, okay,

2  without, in any way, affecting any appellate rights.  If

3  you're telling me your review -- brief this issue and

4  you give me an authority that says we cannot have that

5  hearing without impacting their appellate rights, then

6  I'll reconsider my decision.  But other than that, it's

7  a hearing that I would be inclined to have.

8          Do you understand?

9          MR. GARCIA:  Yes, Judge.  I think this is their

10  motion.  They should be filing the brief, and I should

11  be responding.  Why should we have this matter when I

12  have indicated to you, in magistrate court -- courtroom,

13  that I want to appeal your decision of a motion to

14  dismiss to the district court?

15          I mean, if the Court wants me, I will file

16  the -- the petition or the briefs so that we hold on to

17  this *Lafler Frye* hearing.  But they should be the ones

18  that they should tell you under what authority they have

19  to bypass this pretrial.

20          THE COURT:  Here -- here is the thing, I

21  granted that, all right?  I granted that.  But you're

22  taking a different -- not a different position.  You're

23  taking a different position today based on my decision,

24  and, you know, I had -- I understand why you're saying

25  that.

          MR. GARCIA:  Yeah.

          THE COURT:  But the issue is, if you're telling
me, now we can't have that hearing, I want -- I want you
to tell me why we can't have it.

          MR. GARCIA:  Okay.

          THE COURT:  And -- and you can file it in -- in
the form of a motion to reconsider the granting of the
*Lafler Frye* hearing, and I will -- I mean, I'll continue
that issue, but -- but I'd like something --

          MR. GARCIA:  Yeah.

          THE COURT:  -- as soon as possible.

          MR. GARCIA:  And also I just want to point out
for the record --

          THE COURT:  Yes, sir.

          MR. GARCIA:  -- now that you're asking me to
file this, I'm going to -- I'm going to argue that it
was fairer for you to -- to grant it in advance.

          THE COURT:  And that's fine.  You can raise
those issues.

          MR. GARCIA:  Yeah.

          THE COURT:  Okay.

          MR. GARCIA:   It was fairer to grant it because
I assumed you granted it before making a determination
on the motion to -- to dismiss on this, that was already
decided.  But yes.

1       THE COURT:  I just decided today --

2       MR. GARCIA:  Okay.  Okay.

3       THE COURT:  -- so the answer to that is yes.

4       MR. GARCIA:  I just want to make sure that

5  that's on the record like that, yeah.  Okay.  Okay.

6       THE COURT:  I mean, but -- but here's the

7  thing:  What I'm going to afford you is the opportunity

8  to provide some authority to say, Judge, you need to

9  reconsider that, and -- but, you know, I would like that

10  issue -- and you can address it separately or whatever,

11  but I also want you to give me to -- to tell me what my

12  authority is to stay this issue pending appeal.

13       MR. GARCIA:  Okay.

14       THE COURT:  Okay.  Because we have that -- and

15  we have a trial setting set on Friday --

16       MR. GARCIA:  I will do so, Judge.  I will do

17  so, Judge.

18       THE COURT:  -- which --

19       MR. GARCIA:  But I just want to remind the

20  Court of the extreme hardship and prejudice that my

21  clients will face, [indiscernible] and continue --

22  continue accordingly and maybe creating possibility of

23  waivers for -- for these clients.  So I need to be --

24       THE COURT:  I'm not sure I follow you on

25  that.

1    MR. GARCIA:  What I -- what I'm saying is that

2  thanks for the opportunity to give me -- that you're

3  giving me to file that brief so that we could stay this

4  proceeding because at stake -- at stake there is some

5  major important interest of these clients.

6    THE COURT:  You have an absolute -- they have

7  an absolute right to appeal this issue.  I don't want to

8  make any decision that would impact on that.  That's why

9  I'm giving you these opportunities to address that

10  issue.

11    MR. GARCIA:  Thank you.

12    THE COURT:  And -- but just to be clear, okay,

13  I'm asking you to file something in writing where you're

14  making your request in writing to stay these

15  proceedings, okay?  And we have that trial setting on

16  Friday.

17    The second thing is, with regard to the *Lafler*

18  *Frye* hearing, that you take up -- basically, I mean, if

19  you're asking the Court to reconsider that, which it

20  seems like that's what you're doing, you tell me why we

21  can't have it --

22    MR. GARCIA:  Okay.

23    THE COURT:  -- given -- given the fact -- you

24  know, and I guess what you're driving at is that it

25  somehow could impact --

```
 1              MR. GARCIA:  Absolutely.

 2              THE COURT:  -- potentially the appellate --

 3              MR. GARCIA:  Constitutional rights.

 4              THE COURT:  -- rights, but you have to show me

 5    that, because I will tell you I'm inclined to have it,

 6    to put it on the record, and do it sooner rather than

 7    later.

 8              So you address these issues.  I just would ask

 9    you that you address them in short order, all right?

10              MR. GARCIA:  I will.

11              THE COURT:  Anything else?  Anything else,

12    Mr. Garcia?

13              MR. GARCIA:  No, Judge.

14              THE COURT:  All right.  Anything else from the

15    government?

16              MS. FRANCO-GREGORY:  No, Your Honor.

17              THE COURT:  Okay.  Very well, then.  We're in

18    recess.

19              (Proceedings concluded)

20

21

22

23

24

25
```

1          CERTIFICATE OF ELECTRONIC RECORDING

2

3          I, Rhonda McCay, CSR, RPR, certify that the

4    foregoing is a correct transcription from the electronic

5    recording of the proceedings in the above-entitled

6    matter.

7          I further certify that I am neither counsel

8    for, related to, nor employed by any of the parties to

9    the action in which this electronic recording was taken,

10   and further that I am not financially or otherwise

11   interested in the outcome of the action.

12          Signed this 5th day of December, 2017.

13

14

15   /s/ Rhonda McCay_____
     Rhonda McCay, RPR, CSR 4457
16   Date of Expiration:  12/31/2018
     REPORTERS INK, LLC
17   221 North Kansas, Suite 1101
     El Paso, Texas 79901
18   Ph.: 915.544.1515

19

20

21

22

23

24

25